at 23-3058. Mr. Flores? May it please the Court, I'm Chad Flores. I represent Defense Distributed and the Second Amendment Foundation. Five minutes is the rebuttal request that we have.  Thank you, Your Honor. For six years, the Attorney General of New Jersey has blatantly violated the Constitution by censoring my clients. For six years, we have litigated against this censorship with diligence, asking the courts to employ normal procedures to render normal relief. But for six years, we've had no avail because the Attorney General of New Jersey has enacted, quote, what appear to be flagrant prior restraints with, quote, tactics suggesting the abusive manipulation of federal court procedures in order to delay or altogether avoid meaningful merits consideration of these claims. Those, of course, aren't my words. Those are the words of the Fifth Circuit in Brock, which is the keystone here. Counsel, we'll talk about the merits in a bit. But on this question of transfer, you say that the district court here should have sent it back. But didn't the Fifth Circuit itself point out where this all could have been and in a timely way perhaps should have been addressed in your clients moving for a stay before transfer or seeking mandamus from us initially or the Fifth Circuit in a more timely fashion? Where that wasn't done and we've now gotten to the point where there's been a full adjudication in the district court here, how does comedy or judicial efficiency benefit from our reversal on transfer decisions? Your Honor, the problem here is an extraordinary one. There are multiple solutions to the problem. Our side has acted with diligence throughout. The diligence question was litigated in Brock itself. The day after the transfer decision happened from Texas, we filed a notice of appeal. And we pursued that really diligently through the Fifth Circuit. And, indeed, the Fifth Circuit itself issued a stay and vacated the transfer order. So those kinds of extraordinary steps did occur here. There's certainly no prejudice to the other side. And recall that we raised this issue in the district court on three separate opportunities with full diligence. As soon as Brock issued, we called it the district court's attention. That's why the key order here is that July 2022 order. That's the original decision below. And at that time, the case before the New Jersey district court and the case that Brock had confronted were exactly the same. In that case, there are all three of our reasons to grant retransfer. They are all compelling. We have the comedy reason. We have the law of the case reason. And we have, of course, that Brock was correct. What jurisdiction was there for the Fifth Circuit to go forward and to address the merits of a transfer decision at a point where the transfer had already been completed and the cases consolidated on this end? Your Honor, the jurisdiction was the mandamus jurisdiction that they did exercise. So that has been resolved. We can't now collaterally attack the Fifth Circuit's jurisdiction to render that decision. And the jurisdiction was standard mandamus jurisdiction. Remember, too, that at that time, there was still a case in the district court in the Western District of Texas. But the mandamus from the Fifth Circuit was for the district court to make a request. So that has been accomplished. But in terms of any requirement or even deference to that request, shouldn't we be taking account of whether the transferee or transferor court at that point had jurisdiction to address the merits of transfer? Yes, you should account for that. There's a way to resolve this. The district court in New Jersey had a doctrine to follow. They had three doctrines to follow. One, follow the comedy doctrine. They had jurisdiction to make that decision. They did it wrongly. Two, follow the law of the case doctrine when it was rescinded. Or three, relitigate Bruck if you want and create the mother of all circuit splits. But that should be avoided the first instance. Comedy is a rule of decision. It's like stare decisis. It's not inexorable. It doesn't have to be followed all the time. But when Court No. 2 faces an issue that has been squarely decided by Court No. 1 in the same case, comedy compels deference to that decision unless there's some compelling reason not to do so. That's the first and easy way that this case should have been resolved. But instead, the district court below essentially bummed its nose, disagreed respectfully with the Fifth Circuit, but essentially just disagreed with the result. And that can't be the way that these kind of disputes are resolved. Otherwise, there's going to be very serious chaos in these transfer cases. We also have the law of the case doctrine, which is just as compelling here. I mean, that's straight out of Wright and Miller. It's a Supreme Court decision in Christensen. Why wasn't the right way to ensure that there's not chaos to be not to simply file a notice of appeal, but before a transfer has been completed for the party opposing it to seek mandamus relief, the transferor court of appeals, or when it got here to seek mandamus from us? But instead, it went forward, and we now have a final judgment. The reason, Your Honor, is that we pursued relief in New Jersey with all diligence. Before we seek mandamus, we are obliged to give the district court every opportunity to do the right thing. So the district court issued Order No. 1. It refused retransfer, and we asked the district court to reconsider that order to make sure it was really sure it was going to do this. And so that was a pursuit of diligence before we came here and asked prematurely. We needed to make sure the district court really wanted to flaunt Bruck, and then we had a change of district courts below. And when there's a change of district courts, before we ask this court to issue mandamus against the district court, we need to make sure that the actual judge who is going to be mandamus has an opportunity to rule. And so that's the procedure that we followed here. We tried not to bring this prematurely. We certainly brought it with all diligence in this case. We pursued it all along the way. We've been litigating this for six years, Your Honor. We've asked literally every single court we've been in front of to issue a preliminary injunction to sort of stay things so that they can litigate, and that has never happened, not because of our fault, because of their fault. This question of diligence was litigated in Bruck, and the question of whether the Fifth Circuit had the power to vacate the transfer order was litigated in Bruck. This has all been fought. It's a tricky issue, I understand, but they lost that question. If pressed, our position in the Fifth Circuit and our position here is that the Fifth Circuit does have the authority to essentially pull a case back. The Fifth Circuit disagreed. They said we don't have the authority to order it back, and so all they did was vacate the transfer and issue the request, and so now we're here. But that doesn't lessen the court's obligation in the District of New Jersey to afford a comedy as a rule of decision and to respect it as law of the case. Those are compelling reasons. We've seen no decision in this context, in a transfer context, where a court won't follow that earlier decision in this case. The Supreme Court has told us in Mass Foods that this is not a requirement. Comedy persuades, and individual judges are to still follow their own conscience. We're reviewing here for abuse of discretion, where the district court made the determination that transfer was proper, and then proceeded to move forward with the case with a consolidation, and at this point, with a judgment. Why should we say that it's an abuse of discretion for the district court to exercise its conscience as it did? For the same reasons that in stare decisis, you, of course, at the end of the day, in some extraordinary cases where there's been a grievous error, you need to differ with a court that's already decided the question. The usual result, the result in virtually all cases, is that you follow what the prior court has decided, and here, that precedent is compelling. There is precedent for this. We've given it to the court. That's the Feller case, which says whenever possible, these coordinate courts are supposed to defer. That's the Byrd case, which says that these considerations apply with high strength. There are cases when there's been collusion, when you think the first court was doing something it didn't have jurisdiction to do, that maybe you would address that. But here, all of that is resolved in front. If there is ever a case for comedy, this is the case for comedy. And it doesn't rest entirely there. If you don't buy the comedy argument, look at law of the case. This is also orthodox hornbook law, which says that court number one decides the question when the transferee court, this is the Wright and Miller decision, this is Christensen from the Supreme Court, in transfer cases in particular, when court number two receives the case, they're not supposed to decide anew whether there's been an abuse of discretion. It's plausibility. Was the first decision to send the case plausible? Here, the first decision was undoubtedly plausible, and so it should have been accepted by court number two. But the first decision was the decision in Texas to send it here. No, Your Honor. The first decision in this context is the Fifth Circuit decision, right? The controlling decision from that court. That's the controlling decision that came to the court of New Jersey. But we have our case law that says once the transfer of a case has been completed, that the transferor court and the court of appeals lose all jurisdiction over the case. That's a disagreement with Bruck, Your Honor. If this court wants to issue a holding that says Bruck was wrong and Bruck should not have exercised jurisdiction, number one, we don't think that's possible because that's a collateral attack on a Fifth Circuit case that's been litigated. If they wanted to argue that, seek cert. So that's impossible, and it's also wrong, Your Honor. We don't have to opine on the Fifth Circuit's view of their own jurisdiction. We have our own case law that we need to be governed by when we are going through the process of reviewing the decision in front of us. And our case law says that there's not jurisdiction in that context. Which jurisdiction? Jurisdiction to do what, Your Honor? I want to be very precise in the answer. Our Third Circuit jurisdiction says that the transferor court loses all jurisdiction at the point that the transfer is complete. So that's what governs us in making our determination about whether the district court here abused its discretion in the determination that it made. If I understand what the concern is, it's that if we had tried to bring the Fifth Circuit mandamus we did here in the Third Circuit, it maybe wouldn't have worked because the Third Circuit would have thought, oh, we can't pull back the case. So it may have, under our case law, before the case moved forward with something like consolidation or any further merits determination. But that didn't happen. So, Your Honor, I have an answer to consolidation, and it's a strong answer, is that consolidation has no substantive impact on a case. We told the court this. This is our citation from Wright and Miller, 2382, and we told the district court this. Consolidation is just an administrative matter of putting the two cases next to each other. That's the only thing that had happened. There had been no substantive action in the case when we first asked for the transfer, and we told the district court this. This is why we asked reconsideration. When we first moved, the cases had been consolidated, and we told the court, transfer the Texas-born case back to Texas, and the district court thought something about consolidation impacts that. The attorney general hadn't argued that. It was a sous-response argument from the court, and so we moved for reconsideration and said, no, no. Consolidation has no impact. It's just an administrative joint of the cases. There's been no actual substantive access. This court also has an opinion on that. It's the Penn Associates case that we've given the court. Consolidation is meaningless for the substantive things we care about, and so that was the only thing that had happened when this case was before the district court. In the things that matter, in the material comparison, the cases were identical. The procedure posture is identical. Nothing meaningful had happened, and so there it really would have been an abusive discretion, and it was an abusive discretion, not to send the case back. If you play any deference at all, any value of comedy, any value of law of the case, then the case should go back under those standards. Time clearly flies when we're dealing with very interesting issues. It does. So let's add 15 minutes. We haven't even gotten yet to the interesting First Amendment issues here. Sure. But before we turn to those, my colleagues have questions regarding transfer. Thank you. Let's move on then to merits issues. Sure. I know there are a lot. I'm happy to field questions. I have three things I'd like to say.  yes, you are. That's number one. Great. On to number two. So number one is the question of whether these files constitute speech. Number two is the civil censorship. I really want to devote time to the civil censorship. And then three is the bucket of criminal censorship actions. But the threshold error below is the question of whether the files in this case constitute First Amendment speech, and they do. We have at least pleaded that they do. There may be some factual dispute later with us and the other side about how they work in function. They may disagree with what we say these files do, but if ever there is a complaint that pleads files are speech, this is that complaint. Have the other side tell you what we should have pleaded and didn't, because it's all in there. If you want to know exactly what kind of files, what species of file, that's pleaded. We give you a laundry list of exactly which files are at issue. If you want to know how they work in terms of what expressive nature we have, we plead that in paragraph after paragraph. They have values in the abstract. They're information stores. They're used primarily for design. If you want this complaint to tell you what role they play in the process of manufacturing a firearm, the complaint addresses that as well. On every material legal question that arises on this issue of whether they're speech, the complaint gets particular allegations about how these files work. And the reason we can do that is because in a prior restraint, they, the Attorney General, has targeted us for existing speech. Remember the cease and desist letter didn't say don't publish some abstract set of stuff that we don't have to imagine what it would be. They said, we see what you're publishing now. Stop publishing all of the printable gun files. So we know exactly what these files are. We can talk about exactly what the formats are. If you look in the record, document 14851 is the liberator code book. It's 450 pages of the actual source code of one of the files we're talking about here. It seems like plain text and manuals are not what is covered by the terms of the statute. Oh, so that's a separate question, Your Honor, of whether we've pleaded this as a speech case. But the threshold question is, is there any speech implicated? The answer is yes. They absolutely are covered by two things. Remember, we can talk about the statute in a second, but just look at the cease and desist letter. The civil restraint here, right, it doesn't speak in any of the terms that the statute does. The languages are, this is what they tell us to stop publishing, quote, the files you plan to publish. That's paragraph one of the cease and desist letter. That's appendix page 334. The command, the law from the state of New Jersey is stop publishing the files you plan to publish and stop publishing printable gun computer files. I don't know what that is because that's a term they made up, but that's the scope of the censorship here. So anything you think of as a printable gun computer file is covered by this. Anything that we were publishing before, the files you plan to publish is covered by this censorship, and that bucket of files is undoubtedly protected by First Amendment speech. If there's a mixture, if some of the files we're publishing are protected and some are not, we win because the Attorney General chose to censor it all with a blanket censorship. So that's the civil side. Would you like us to distinguish the expressive from the functional aspects? Would I or how would I? How would we do it? So the question then is a technical one of during this process, which parts of the speech become conduct? Our answer is that none of the speech here is part of the conduct, right, that none of this is integral to terminal conduct. This is all attenuated. So this is why you look to cases like Ashcroft that talk about speech that, in an abstract sense, is part of the factual causation of an event happening. But in the law, the only speech that we deem integral to criminal conduct is speech that isn't attenuated, but that is happening right then in the moment of the action. So the question is what have we pleaded? The pleadings we point the court to are those pleadings on appendix page 257. That's where we say that this is a slow process. And recall that this is essentially a divorce process. We don't know who's receiving the speech, the files. We're not in their living room working with them on these projects. In time, it's massively temporal. And even in causation, the person who's sitting there at home, right, they take one piece of a blueprint, one piece of an instruction, and it takes a long time. There's a lot of deliberation and considered action. No precedent that talks about what you can actually apply a speech prime to applied to this kind of attenuated process. Yes? Help us more broadly understand what the boundaries are of protected speech in the context of computer code. If it's code that is giving an instruction to a machine to perform in a certain way, what is the First Amendment protected expression? So the code isn't doing anything itself, Your Honor. We plead this. You can look at page 257 of the appendix. This is page 28. I'll quote from the complaint. These, they're not functional software. They do not self-execute. They are mere information stores. They are not functional software. If I can give you something of analogy, when you produce your court opinions, right, you'll be on a word processor. You'll use an application like Microsoft Word. That's software that does some work behind the scenes. We're not talking about that here. There's a printer that actually takes the software version of your opinion and cranks it out into an actual piece of publication. We're not talking about that here either. What we're talking about are some version of text files that give you some of the text that might end up on the screen. You're going to change the font. You're going to change the content. You'll edit it. Maybe it ends up as the final product. But we're talking about those raw ingredients. Maybe one photo that you put into your opinion if you want to demonstrate something, a selection of text. These are models, things that people often use when they're not going to produce anything at the end of the day. They're just using it as a model to study the scientific properties. These are engineers working on projects. Often these files play no role whatsoever in any production of an actual firearm. This really is the concept of a blueprint, an illustration, raw data. To the extent that the court thinks I'm not sure exactly what is being censored here, that's a point in our favor, not theirs. The whole reason that we don't have prior restraints is because this process of figuring out what they're going to jail us for and what they're not is what the Constitution is supposed to stop. After the fact, if someone has actually committed a crime and they think that this speech was integrally involved in that crime with the necessary proximity, they can prosecute the crimes after the fact. But here you have the worst kind of civil censorship beforehand, speaking in broad terms that says literally stop publishing the files you plan to publish. This is straight into vandum books as a prior restraint. It's straight into the backdoor decision. The classic version of the reason you don't let this happen is because we can't figure out what's covered and what's not. That's why we have the due process claim on the back side. Are you taking issue with the licensing and registration scheme in New Jersey? If pressed, we would, but we don't need to here. So there is an exception, and the statute says that if you have an FFL, then apparently this kind of information can be exchanged. We think that's a point in our favor, not a point against us, right? Because this is supposed to be narrowly tailored to solve some sort of epidemic of a problem, but they allow for exceptions, and so that shows you that it can't be as bad as we think. Is there a CYATR requirement? There's not, Your Honor, and this is another of the critical problems. There needs to be a state of mind. The district court seemed to think two things about this statute that are wrong. One, the district court thought that this statute only applied to files that are actually used in the process of making a firearm, but that's not the case. It applies to everything that may be used, and there's also a missing CYATR requirement. We need to know what the files the speech is being used for in order for any criminal liability to attach, and this statute does not require it. They want to read one in silently, but that's wrong. Other statutes nearby in this same statute actually use express CYATR requirements, and this one has none, so that's another in the laundry list of faults about why the speech crime cannot be enforced against the plaintiffs here, and it's important to realize that once you cross the threshold of saying that this is First Amendment speech, I think we have to realize this is content-based speech. They're taking a subject, a category of speech, and saying you cannot talk about this topic. Once you ban a topic of conversation, you turn to the laws of content-based regulations, and it cannot survive on that front. Can you hear me? Yes, go ahead, Judge Rendell. I'm having trouble hearing, so I'm glad you can hear me. Back to the issue of speech, I'm having difficulty trying to figure out exactly what message or information is being conveyed. You say it's computer-aided design files and digital firearms information, but what exactly is it? You seem to be talking around the issue of exactly what it is. If I send someone a poem, I know I can look at that poem and see what it is. If I send someone something that is DKZ 436, I can see it. I can't envision what information is being sent here. You say each file has values in the abstract. Well, that doesn't tell me anything about what the files themselves are, what they consist of. In order for us to determine whether it's speech, we need to understand what that is. Can you explain to me exactly what that information is and what the message is that's being conveyed in these files? I can, Your Honor. The complaint does that. If you want the citation. Where does it do that? Appendix page 260, Your Honor. Appendix page 261. These are laundry lists of examples of the files. You'll see a laundry list of A through M. These are the files that we were publishing. These are the files that the Attorney General said you must stop publishing. And you'll see in the laundry list that we describe the subject of the information. So we have certain firearms and firearm parts. And then we describe the kind of files. So there are a series of files that are unique to the sort of engineering context. If I can reason by analogy, these are essentially photographs and diagrams. You can't open these in Microsoft Word like you would, but there are applications you use them. So you would open it and see what amounts to a photo that you can interrogate. So you can look at it. You can zoom in. You can zoom out. You can edit it. You can decide, ah, this nut that in this diagram is shown to be these proportions. I would like to make it smaller or larger. You'll also see in the laundry list these diagrams of firearm components. You'll see in subject K, so this is appendix page 260, that we have read me plain text files about assembly methods. We do give people instructions like a blueprint might and say in order to complete this process, this is how part of the process would occur, just straight textual instructions. You'll also see here text files, this is subject L, about the National Firearms Act and about the undetectable firearms. Are these part of your complaint? Yes, sir. I'm reading you from appendix page 260. These are in the complaint. And we also, Your Honor, they're also on page 261. Then what we do is we do the intermediary parts. So we both give you the granular detail by telling you exactly what kind of files they are. We also say the ultimate legal conclusions. These are protected speech. We have read the precedent, and the people at the company know this well. And so we made the intermediary assertions that say in this process, our role is attenuated. And we allege that. Those are the allegations at 256, 257, and 258, right, that this doesn't happen as a self-executing process. It's not as though I hand you one of these files and you click and a gun comes out. That just doesn't work. That's not how the process works. That is a fiction, and that's the kind of fiction that gets litigated on summary judgment. How can we assess the functional versus the expressive aspects of this speech? As a technical matter, you do it on summary judgment with evidence. As a legal matter, I think you have to look to the very small, tiny set of cases where courts have said that speech is itself an integral part of conduct and compare this case to those. I know of no authority in this court or any other that says this kind of speech that is so attenuated in time and this kind of speech that is so attenuated in content is integral to the criminal conduct that they presuppose at the end of the road. Remember, Your Honor, this speech can be used for all kinds of things that are totally legal and are not prescribed by anyone, not New Jersey or any other state. It's totally legal to just look at the picture or the diagram. It's also totally legal for many individuals to create their own firearm, right? There's one small subset, sort of hypothetical, of the terrorist hypos where someone's going to take these files and use them in a crime. That's just as true for any dangerous book, for any dangerous speech, for any of the famous cases we know about dangerous information in society. I think it's their burden, because we've established that it's speech, to show you that it fits in the prohibited category. It's not our burden to prove to you that it has these values, but we've done so anyway. Why shouldn't we look to the face of the statute, which the prohibition is on a person to distribute to a person in New Jersey who is not registered or licensed as a manufacturer, so it's only a prohibition as to folks who don't fit that category. And then what's covered in terms of the prohibition on distribution is digital instructions in the form of computer-aided design files or other code that may be used to program a 3-D printer to manufacture or produce a firearm. Doesn't that—I mean, you've certainly listed a lot of different things here that go, for example, to plain text, but the statute on its face doesn't seem to cover many of those things, and the limitation on distribution seems only to be to those who are not licensed as manufacturers. So are we talking about something much more narrow, which goes to programs that are instructing a computer to produce a product? The answer is no, for three important reasons. Number one, everything we just mentioned is about the criminal statute, not the civil claims. The civil claims are totally independent. The civil cease and desist letter, I can hang my entire case on that part of the litigation. But as to the criminal statute, remember, it doesn't say that this applies to files that are in fact used in the process you described. It says it applies to files that may be used, and that's the critical juncture, is that they may be used for that process, but they may also be used for reams of totally legal, permissible conduct, and that is the problem in the statute. It's both a First Amendment problem and, if we need to, a Second Amendment problem. We do assert a constitutional right to create your own firearm. If push comes to shove, we can litigate that. But the question here is just on the speech side. What they say is actually illegal. If you spot them, cover your eye, ignore my Second Amendment argument. Assume that they can ban private gun making. They can't ban speech about that. Ban the conduct if you want, but you can't ban speech that is in the abstract about it, that is attenuated from it. This is the classic First Amendment argument. You can ban the rioting, but you can't ban the speech two weeks beforehand that talks about maybe we should do that. And, of course, this is nothing to write. The Second Amendment is sacrosanct, and there are reams and reams, and citizens who do this for totally legal reasons when they create the firearms. And most of this industry really right now is an abstract industry. These really are just designers who are thinking in the abstract about how to solve these engineering problems. That really is most of what's going on here, not what the statute wants you to hypothesize about a terrorist in this case. And so the key here, though, the speech crime is not narrowly tailored. If you think there's only intermediate scrutiny going on, if you think that this isn't, you know, strict scrutiny and that you have to look at how well this statute does its job, fine. We still win because even under intermediate scrutiny, they have to show that it's narrowly tailored. They have to show that it's not over or under inclusive. They have to show that they're actually advancing the interests, and that's what I want to focus on now. This statute doesn't actually solve their problem because, remember, the Internet is essentially impossible to tame, and these files are all over the Internet in all kinds of capacities. The real reason this litigation is happening is because my client, Defense Distributed, is public enemy number one. They want to go after one person in this field to chill the speech. This is not actually to solve the problem. So in technical litigation terms, they enact the law, and they say it passes intermediate scrutiny. We have pleaded, no, it doesn't because your law is totally ineffective. That pushes the case to summary judgment. Now we have to litigate whether this kind of statute can even conceivably solve the problem they're trying to solve, and it can't. I see that my time has expired, but I'm happy to answer further questions the court has. Judge Randolph, any questions? Nothing further. Thank you. We will hear from you in rebuttal. Thank you. May it please the court. Appellants demand the right to distribute computer files that allow anyone, including terrorists, felons, domestic abusers, minors, and the mentally ill, to print untraceable but fully functional guns without ever going through a background check. But appellants' plea contention under the First Amendment fails for two separate reasons. First, they failed to properly plead their claim that the files are protected speech under the First Amendment at all, and they declined to replead even after the district court gave them multiple opportunities to do so. Second, even if the files are protected speech, Section L-2 is a content-neutral regulation that plainly survives intermediate scrutiny. The legislature, recognizing a serious emerging risk to public safety, nearly unanimously enacted Section L-2 to prevent circumvention of state and federal firearm manufacturer safety rules. Ms. Kiley, if what you have distributed we're putting out there were images of firearms and blueprints, written instructions, the government would concede, then, that those were protected First Amendment speech, right? Yes, you're exactly right, and we would say that that is exactly what Section L-2 does not cover. So what do you do with the point that it does say, nay? I think, read in context, the plain language makes it clear that what the legislature was trying to do is take, hone in on the digital instructions, either in the form of computer-aided design files or other instructions, that may be used to program a three-dimensional printer to manufacture or produce a firearm, firearm receiver, or component. So it's not any kind of information on the Internet that may inspire someone to do so, that may encourage someone to do so, or that may give someone an idea of how to do so, but rather it's whether or not the files may be used to program the 3-D printer. That is a functional targeting of the statute. The step in that is to pull up an image and to make adjustments for the user, to make adjustments to the size, the shape. Why isn't that covered by the statute? So, Your Honor, I think we have to take a step back, and part of the inquiry is difficult to engage with is because they don't have the specific pleadings to explain what the files actually do. If I heard Mr. Flores correctly just now, that there are files we want to distribute that are just diagrams or just photographs of firearms or just text files that talk about how great it is to 3-D print firearms. Those are not things that may be used to program a 3-D printer. But if it's the case that what they're talking about are files that can be inserted into a computer, hooked up to a 3-D printer, and if the user may be able to adjust what color I want the end product to be or if I want a big one or a small one, but regardless of that, what it will do when you hit the button is actually produce a functional firearm. That would be prohibited under Section L2. But are we getting beyond ourselves and beyond what the district court did here? The district court said that the pleading wasn't sufficient. We really don't get beyond that, do we? I think that's exactly right, Judge Rendell. All right, so how is the pleading not sufficient? There's two reasons why it would not be sufficient. The first is that the appellant didn't plead enough facts for a court to even conduct the analysis, which they don't challenge at the test under Vartuli from the Second Circuit, which is if the file in the form it was distributed completes its function without the intercession of the human mind, it does not protect the speech. They don't dispute that fact. But they do plead that to fabricate the object, the user needs to do multiple things, a complex series of actions. So they say they're pleading the fact that it is not automatic. Isn't that sufficient? No, Your Honor. I think what they're pleading is actually not about how the file itself produces or doesn't produce a firearm without the intercession of the human mind. Instead, the complaint at paragraphs 28 to 29 talk about how a human being has to obtain the equipment, such as the computer, the 3D printer, the spool of material that goes into the 3D printer, and, of course, to spend the time and energy to run the program. But that's what every human being has to do before and after running any computer program. But that's not the test that Vartuli set out. Rather, what the complaint doesn't do is explain how the file itself actually communicates expressive speech to human beings. This idea of volition that they plead is kind of a red herring because, of course, for any computer file to execute, there has to be some human volition to get the file. So, for example, a computer virus that will operate as soon as it's inserted into a computer is not speech merely because a person has to obtain the file and insert it into the computer and have the volition to do that. But we would not say that all computer viruses are protected speech. So that's the problem with the pleading. It talks around these issues, but it never actually pleads what it is that the files do, what kind of code they contain, if it contains code at all, and how that communicates with a human being before it actually accomplishes the function that it's designed to do. The second thing that I think appellants don't really talk about because they make assumptions is that because the files have information stores or are information stores, they are per se protected speech. But that can't be correct. And, Desiree, you mentioned that they talk about how these files have... they supply information in the abstract. But that's not the standard because everything is capable of supplying information in the abstract. And I think if that were the test for whether or not something were speech, we would be protecting a lot of things that we wouldn't be today. So consider I'm driving my Honda Civic down the New Jersey Turnpike. Physical car, no code involved. I'm doing it at 100 miles an hour. There's no question that that is not protected by the First Amendment just because I'm expressing myself by doing that. Just to be clear, I wasn't doing that this morning, Your Honor. But under appellant's view, if I'm not the driver, but it's a self-driving car with code and I switch on the program that tells the car to drive at 100 miles an hour, that automatically becomes protected speech just because someone can look at the code and make expressive or make some kind of informational judgment from it. That just doesn't make sense under the Bartuli test for any of the precedents that the courts have established. But even if you disagree with me, and even if you disagree with the district court about the lack of pleading, the lack of specificity that would allow a court to be able to even adjudicate the First Amendment question, assuming that the files have some expressive value protected by the First Amendment, the question then becomes, is it a content-based restriction and does it survive the level of scrutiny that applies? And on this, the appellants really don't have a lot of answers because Section L2 only targets functionality. That is, even if the code has some other expressive value, that's not what the law is targeting. This is how you know that it doesn't target the expressive value. It doesn't prohibit licensed manufacturers from receiving 3D files. But again, aren't we getting ahead of ourselves? Wouldn't that be on remand for the district court to decide? We are a reviewing court. I think, Your Honor, you could do that, but I think because it's on a motion to dismiss and we have provided the court, both the district court and this court, with all of the analysis needed, the question of whether or not the statute is a content-based restriction or not is a pure legal question about reading the statute. And because the intermediate scrutiny question in this case is so obvious, it's an interest that this court has already recognized in prior precedents, like Marzarella, and the objections that the appellants have lodged are really not apt. This court can also just make that conclusion now based on... If you do want to get there, isn't there an overbreadth problem with this? Because these files may be used to produce a firearm, but on the other hand, they may be used for artistic purposes or for me to just look and say, boy, that's interesting. So don't you have an overbreadth problem with this statute? I don't think so, Your Honor. So I take your question to be even if we assume that the appellants have properly pled some expressive element that they have not. As you say, you're urging us to decide it rather than send it back, and I'm saying if we were to decide it, would you address the prospect that this statute reaches too broadly? Yes, Your Honor. So the Supreme Court in both old decisions and very recent ones, like Hansen and Netchoice, have explained that an overbreadth challenge, even on First Amendment grounds, requires a showing that the ratio of legitimate to invalid applications is lopsided. Appellants have never attempted to even plead this. There's nothing suggesting that the number of applications that Your Honor may be referring to would be a larger percentage or would be a substantial percentage of the applications than the applications that the state has an interest in regulating, which is the kinds of files that we're talking about here allow an individual who has not cleared any background check to print a functional firearm. And I think that's the interest that the legislature was looking at, and appellants haven't demonstrated why the ratio of that legitimate interest would be overcome by some other hypothetical interest in someone picking up this. All the more reason to remand this. I actually think that's a facial problem with the pleading itself, and it would not be necessary to remand. Now, to be clear, the district court held that because the pleading was so deficient, it needed not even look at the overbreadth problem and gave appellants the opportunity to amend. They did not do so. He gave them another 14 days, and they still chose to stand on the deficient complaint. And so for those reasons, I think we're looking at what the complaint contains. There is nothing that they're suggesting that they're going to add to it. And so the analysis of whether or not the law is content neutral, whether it's overbroad, et cetera, et cetera, can all be adjudicated based on the same papers that this court already has in front of it today. And why or what is described at paragraphs 41, 43 of the complaint? Why is that not adequate in terms of telling us what is at issue here and what is being conveyed? Yara, I think paragraphs 41 and 43 actually exhibit the problem that the district court was talking about. It does list the file extensions, right? And the IGF files. But it says nothing about how those files function to either print or not print a 3D-printed firearm. They talk about there are files for a single-shot firearm known as a liberator. There are files for a firearms receiver for AR-15 rifles, which are unlawful in New Jersey. But they don't say anything about the functional aspect. That is, does it just instruct the computer to do something, or does it actually communicate something expressive to a human being? And that's the test that all of the courts of appeal that have looked at this topic require to even make the analysis of whether the threshold question of whether the First Amendment applies at all. Does that include diagrams of firearm components, renderings, plain text files? Yeah, so I think that if the files are just diagrams and renderings, as I understand what those words mean, I don't think that's prohibited by Section L2. But I don't know whether that's true for serial lithography files about firearm components. Is that something that gets inserted into a computer and you don't need somebody to do anything other than put it in, perhaps follow technical instructions for hitting print and hooking up the printer to the computer? If that's true, if that's all that requires, then there is only a functional element and there is no expressive element. But if there is something about the files that were applied to have an expressive interaction with the individual, then perhaps there would be an expressive element. But there's just nothing in the complaint, which is very long but doesn't actually explain that element at all. And then how are paragraphs 28 and 29 deficient in terms of saying they aren't just inserted in a computer? Yeah, so this is actually exactly what I was talking about just now, Your Honor. So in terms of the volition that it talks about, if and when a person chooses to perform a complex series of actions, this is paragraph 29, what they're talking about is selecting suitable component materials. I understand that to mean selecting the spools of plastic or other material that goes into the 3D printer, choosing an effective manufacturing process. That may refer to buying the right 3D printer. These are things that have nothing to do with how the files function. These are things that talk about whether a person wants to print the file or not. But the files themselves, the thing that appellants say have First Amendment value, are not described in terms of how they actually impart First Amendment communications in any way, shape, or form. So the allegations that you need to have a person who wants to do this thing, sure, we accept that. But that doesn't say anything about the First Amendment values that the files themselves espouse. But what is the theory of First Amendment speech in this area? I mean, do we look... Some courts have said source code, protected speech. It's written in computer language. That's expressive. If programmers are able to communicate with each other by the way that they have programmed something and designed it, that communicates something. Where does this idea of computer code serving a functional purpose, taking it outside of that protection, if inherently the medium is language, is a communicative medium? Yara, I see my time has expired. May I continue to answer? You may. And just to clarify, was 15 minutes added as well for appellees? Thank you. Your Honor, I think that is a bigger question that I submit Your Honor doesn't necessarily have to answer because of the pleading deficiency, but just to engage with it for a second. I think that just because something, either it's computer code or if it's something in the physical world, can impart information to somebody who's looking for that information. So I'm looking at a padlock. It doesn't communicate any information to me. But it may communicate information to someone who knows something about padlock design. That doesn't mean that the thing itself and the regulation of the thing necessarily implicates First Amendment values. And I think that the sort of genesis of the test from Judge Sachs' decision in Vartuli illustrates this point very well because in Vartuli what happened was there was a company that wanted to distribute a computer program that basically spit out, individuals who got the program did have to put inputs, right? So instead of plastic into a 3D printer, they had to get a price sheet for, I think it was Swiss francs, to put into their computer. They run the file and the file, the program just spits out an answer. Buy this, right? Someone then has to go and do it just like they have to hit print on a 3D printer. But the court held that is not protected speech because the file took completed function, which is to give the signal, doesn't actually require the intercession of the human mind at all. So just because someone could take apart the file and figure out is it well done or not, would I have written in a different way, could I make it even better, doesn't mean that the file itself and the form it was distributed actually has First Amendment value. I would say we don't even need to get to that question because there's nothing in the complaint that even explains whether, for example, .SLPRT files have expressive code that someone can pick up and react to, assuming that would even be regulated by the statute at all. So I think the deficiency in the complaint makes it difficult, and this is what the district court was getting at, in even making that kind of assessment under VARCHULI or impossible to make that kind of assessment, and that's why it's held that the complaint was deficient and gave the plaintiffs an opportunity to explain that in an amended plea. They chose not to do so and instead to stand on this deficient complaint, and that's why we're here at this posture. What if the code was to 3D print the statue of David? Would we say that's not speech, notwithstanding that what it produces is, by all accounts, a piece of art? I think that's correct. If all you needed to do is to hit print and it just gives you this outcome, the outcome may be protected in some way that also has some First Amendment value, but the code itself, if it doesn't require the intercession of the human mind to complete its intended function, would not have First Amendment protection under these precedents. So let me put it this way. To change the hypothetical a little bit, if the code either printed the statue of David or a potato peeler and the government was interested in which one it chose to do, I think then you may have a content-based restriction on what it is that is happening. Are we just saying that some things are more valuable than others? That's not what's happening here. The restriction that we have is not based on what is it that is being expressed, but rather are you a licensed manufacturer or not and are you able to print this or not? And so that's what the functionality test is all about at step two, at the content-based restriction stage. I think in the first stage, it doesn't matter what the thing is printing. If the code itself actually operates in a certain way without the intercession of the human mind, then it doesn't get First Amendment protection just because it's written in computer code. Just as the fact that the self-driving car is written in computer code doesn't mean that the government can't restrict the output that it comes out or that the fact that it's doing that now turns something that is not First Amendment protected driving above the speed limit into something that is First Amendment protected just because the code is the thing that's telling the car to do that instead of the bicycle on the pedal. What happens when we look to the intersection here of the First and the Second Amendment? Because part of what I understand the claims to be is that there is expression in the production of these firearms of the right to self-manufacture. If that's the case, then how should we think of this any differently than a regulation that bans the printing of a certain subject matter or bans traditional 2D printing? Here it happens to be a 3D printer, but if what's being printed itself communicates an idea, if the act of the printing and the possession of the product communicates an idea, then why don't we have a First Amendment problem because it's really the Second Amendment right that's giving meaning to the expression? Let me answer the First Amendment part first and then get to the Second Amendment. I think that the reason that the law, so now we're on the law as opposed to whether or not the code is speech or not, because it doesn't prohibit many, many, many ideas about 3D printing firearms, it only prohibits the printing of the functional firearm, that means it's not content-based and certainly not viewpoint-based. For example, the law does not prohibit diagrams, for example, a guide on the virtues of 3D printing guns. It doesn't prohibit a picture of the final product and accompanying captions saying, look how wonderful this is. Instead, it only prohibits the distribution of files that may be used to program 3D printed firearms or relevant components. And I think that one way of thinking about this is the examples that appellants raise in their briefing, which is they argued in terms of whether or not government scrutiny justifies, they say, well, if 3D printing poison, the government doesn't regulate that. Well, that's because we don't know of any technology that allows them to do that. But imagine there was. I think according to their theory, just because the government restricted the 3D printing or files that may 3D print poison or methamphetamines or whatever technology you may come up with, that's somehow a content-based restriction. But that doesn't make sense, right? It's actually the production of the thing in the physical world that is being prohibited under the law, not the ideas about the thing. So that's why cases like Corley and Green have held that the Digital Millennium Copyright Act, which similarly prohibits the distribution of files, that would circumvent copyrighted works to be not a content-based restriction. And the same thing in CIMAC, which held that the ITAR export restrictions, which operate similarly in terms of a category of files, solely because of what it produces in the outside world. So that's why it's not a content-based restriction. As to the Second Amendment claims, I do think you have to think about it separately. But before we even get to what is protected by the Second Amendment, I think they have, and the district court rightly recognizes, a fatal standing problem. The first is that they have not fled anything. They actually disavowed their challenging Section L1, which is actually the prohibition of the use of the 3D printer to produce the firearm. So the Second Amendment claims have to hinge on the person being able to produce the firearm. They haven't pled that anyone in New Jersey who wants to receive their code is going to use it to have a 3D printer or will acquire a 3D printer and will use the materials to self-manufacture firearms. That could have been rectified via repleting, but the plaintiffs chose to stand on their complaint, and so here we are. But I think there's a second problem, which can be thought of as either injury or traceability or addressability, which is that even if Section L2 were somehow invalid, which we submitted as not, it actually doesn't redress the Second Amendment problem that they tried to put before the court, which is the ability to self-print firearms. But Section L1 is the thing that actually stops someone from actually being able to print the firearm. And by the way, there are federal restrictions as well that they don't even talk about. So they're not challenging Section L1 or any of the federal laws, and so the Second Amendment injury they allege, which is this inability to self-manufacture, is not traceable to the provision they challenge, nor does it tie to someone who's otherwise not able to print the firearm that they want. It's not the actual distribution of the code that is preventing them from doing so. It's the other section they don't challenge that is doing so. So that's sort of a threshold problem before you even get to the merits of the Second Amendment argument that the district court recognized. If we get to the Second Amendment merits, I think they have two other problems. At the first step of Bruin, we know that plaintiffs have to show, if they're a burden, that the Second Amendment's plain text is implicated by the law. Here, the Second Amendment's plain text applies only to bearable arms, and I think it's fairly obvious that computer code is not bearable, nor is it arms. It doesn't facilitate self-defense, and the other problem they run into is that even if they can somehow tie computer code to being bearable arms, the Second Amendment only applies to arms in common use for lawful self-defense, but we know that because these firearms don't have serial numbers, they're not traceable, those are not in common use for lawful self-defense, and the Fourth Circuit en banc recently held this, and so they run into these two threshold problems at the first step of the merits analysis under Bruin, and of course, if you go to step two under Bruin, the Supreme Court has held time and again that background checks are presumptively constitutional, and the very purpose of section L2 and section L1, which they don't challenge because of the standing problem, is to prevent the circumvention of background checks, et cetera, and so we can get more deeply into the historical analysis and all that, but I don't think that's necessary because of the threshold standing problem and then because of the threshold failure to plead a Second Amendment protection problem. Judge Rendon? Nothing further. Let me just ask you to step back to another analogy of instructions or a recipe. If we think of that as what's being conveyed here and the recipient, as the human recipient has the option in receiving instructions to either do it themselves manually or if they want to expedite the creation of whatever it is they've asked to create, they have a file that they can put into a 3D printer that will do it for them or you could drop it into a sewing machine and rather than doing it by hand, the sewing machine would then do it. Why should we differentiate between those two sets of instructions when the functional output is the same and it's the volition of the person who has asked for those instructions to produce the product? Yeah, so I think what your honor is getting at is what is the First Amendment really designed to protect and of course whenever we talk about this, it becomes a little bit abstract but I think it's actually important. The reason that we have the First Amendment that protects certain expressive communications is because of the capacity that it has for human beings to relate to one another and to their democratic system. That's sort of like the general theory of the First Amendment but if you skip that step via technology and the person no longer has to do that, then the thing that skips that step is not protected by the First Amendment because it doesn't trigger any of those values and so just as me driving a car manually does require effort and I would love to get rid of that effort with a self-driving car. The fact that the car has automated that step, not that I don't think driving necessarily has expressive value but let's say for a second that I'm expressing to the world that I'm a carefree person and I don't care about rules and there's some expressive value in that hypothetical. The fact that that's now been replaced by code doesn't mean that the code itself now has some kind of First Amendment protection because unless the code has the ability to intercede the human mind in some way and the way it's distributed to function has to give that functionality or give off that element to a human being who's then engaging with it. Unless it does that, the code is just then an automatic function that doesn't actually implicate anything about expression or participation with others in the marketplace of ideas, et cetera, et cetera. Why would we read this complaint to negate the expressive aspect of these files? Our argument is how could we read it to exclude the expressive because if it doesn't exclude the expressive then wouldn't it go back for further discovery as to the expressive versus the functional on summary judgment or further whatever. So my question is how do we read this complaint to exclude the possibility that the file's expressive content is there as compared to only functional? Your Honor, I think you don't have to go so far as to say as pled the files absolutely could never have expressive value or could not express First Amendment values to a human being but rather because the complaint doesn't explain anything about whether or not it does, it lacks a First Amendment, a valid First Amendment pleading. So you're saying their pleading has to state that there is clear expressive versus functional use of or aspect to this speech. I think that's right, Your Honor. The only things that they do plead in terms of how the files work actually go more to the functional than the expressive. So, for example, they talk about how certain CAM files are ready for insertion into object-producing equipment and they cite to a Commerce Department regulation where we've discussed in the briefs below how the guidance explains how these are files that are ready for insertion to produce a firearm. Those are very functional items. I'm not saying that they couldn't have pled that either those files or other files that are circumscribed by Section L2 also have expressive value. They don't have that. They do hint at the functional aspect but they say nothing about the expressive aspect of those files. And that's why the pleading is sufficient. I'm not saying it could never have been pled to have survived that threshold step under the First Amendment, but this one just did not. Well, to the extent that... And I guess... Sorry, go ahead. And I guess you could distinguish younger because there they said the purpose of this is to explain how computers function. They have not told us anything as to the purpose of sending these files. That's exactly right. So in younger, the plaintiff was a computer science professor who had a book that explained the encryption code and wanted to show others how the encryption code worked. And so that's very different from what we're looking at here where it's hypothetical that that could happen, but that's not what was pled in the complaint. And so all we have is the names of files and what they ultimately, I guess, are supposed to achieve in terms of the kinds of firearms that they're supposed to be able to print, but nothing about how it gets from the file to the final product, such as an AR-15 receiver. But they've also pleaded that certain things that you concede are protected by the First Amendment, things like diagrams and text files, are part of that same code that they understand to be prohibited by the statute. And then there's separately the cease and desist letter, which their argument sweeps far more broadly than that and would seem to take in not just things that may be used for the manufacturer, but even more. As to the criminal statute, do we need to resort to a doctrine like constitutional avoidance to reach the reading of it that you're arguing for? That is, that even though it says may, that should be read to allow for distribution of things like images and text files. I don't think that Your Honors need to do sort of some constitutional avoidance, although I suppose you could. I'll just say that it's not a unique formulation that may be used to, in terms of how we think it's naturally read, which is that it creates something in the real world. So, for example, NJSA 2C colon 36-1 classifies what are certain drug paraphernalia. And it talks about objects used for inhaling certain substances, such as metal, ceramic, or plastic pieces that contain an interior pen that may be used to expel compressed gas from a cartridge or canister. I don't think anyone in that context would read may be used to expel as, hypothetically, could someone come up with an idea for how to, like that's just not what those words mean. Is it used to perform this output in the real world or not? The same words may be used to program a 3D printer to manufacture a firearm has the same meaning. It's just the natural reading of those words. In terms of the cease and desist letter, Mr. Flores read you the first sentence of the paragraph about the computer files that you plan to punish will undermine the public safety of New Jersey residents. But the very next sentences explain what it is that former AG Raywall was talking about. These files allow anyone with a 3D printer to download your code and create a fully operational gun. More than that, the codes you plan to post will enable individuals to print assault weapons that are illegal in New Jersey. Print assault weapons create a fully operational gun. Those are the qualifiers on what the files that were targeted by the cease and desist letter are speaking of. And I think that's very consistent with Section L2, which also targets the files that create fully functional firearms. And so I don't think there's any daylight between the two. Obviously, at the time that the cease and desist letter was issued, there was no Section L2, but the legislature very quickly thereafter recognized the public safety problem and within months enacted the criminal law that actually applies. And so I think the reference to the cease and desist letter is a bit of a red herring, but I think overall the issue is that the law itself is quite clear, and if they're sort of hanging their hat on, well, what about the diagrams or what about the pictures? Those are not circumscribed by the law. I don't think there's any pleading that they are inherent in the codes that do fully just print a gun, although if they wanted to plead that, they could have. And I will note that, you know, Ms. Flores mentioned, again, the sort of scienter problem. I think they just ignore the fact that the overall requirement in Section 2C2-2C3 says a statute defining a crime unless clearly indicating legislative intent to impose strict liability should be construed as defining a crime with the culpability defined in paragraph B2 of the section, which is knowledge. And that applies to the entire New Jersey Criminal Code. So the fact that one particular section or subsection doesn't have an express scienter requirement, that doesn't matter because all of Section C2, I'm sorry, all of Title 2C, which is the criminal code, imports that scienter requirement throughout. So if that's the problem, it just doesn't exist under New Jersey law. Given the intervening passage of the statute, what is the current status of the civil enforcement effort? I don't believe that there's an active civil enforcement effort given that the criminal law now covers the same conduct. So that's also why we don't think that there's some kind of separate claim against the New Jersey Attorney General that can come solely from the cease and desist letter. So what I will say is in the intervening time, as the appellants have pled, they've created a geofencing system so that they can communicate their code to any other recipient in other states, but they're able to, this is according to their complaint, can basically block out any IP addresses from New Jersey. So they can comply with the law without restricting their ability to distribute the code in other states that don't have these restrictions. Your Honor, I just don't have any other questions. We urge you to affirm. Okay, thank you very much. Mr. Flores. If it's the case, as the Statutes put it, that those things that are more traditionally carrying First Amendment speech, like images, text, those are freely distributable under the statute. What's left in terms of the code that is alleged in the complaint to constitute speech rather than some functional mechanism to produce the product? I'll point the Court to four paragraphs in the complaint, 26 and 27, and 32 and 33. If you're yearning for a way to distinguish functional files from not functional files, this is how the federal regulations do it. They're CAD with a D and CAM with an M. So 26 and 27 explain what CAD with a D, computer-aided design files, do. That, I think, is what the Court is thinking about as sort of protected-type speech. And then CAM with an M, computer-aided manufacturing files, is I think what the Court in New Jersey is trying to get at as the not protected functional stuff. So 26 and 27 explain what those files are. 26 and 27 say that they both have expressive content. And then 32 and 33 say that we publish both. We publish both. They censor both. So they're both implicated in the case. They both have expressive values, we say. But if it's a mixed bag, we win the case because their censorship on both the civil side bluntly covers them all, and their censorship on the criminal side, I think, bluntly covers them all. But that is a distinguishing way. If you think that's the only kind of protected conduct is the design-type files, but not the manufacturing files, they're both in the case, and they're pleaded expressly there under the federal regime. But the State has made the representation that as to design, that it's not covered by the statute. It wouldn't be enforcing it as to that aspect of it. On summary judgment, when we say, how do you manufacture a firearm? The proof will show you take the design file. That's something that may be used to program. Now it's attenuated, right? The law would have you say, right, it has to be direct. It can't be contingent in order to be criminalized. So it's part of the process. You use the design files to produce the final product. But it's not so integral to the final step of actually choosing to make the firearm that you can criminalize it. That spectrum exists on everything. Anytime you make something that the law can criminalize, there's this attenuation. There's the knowledge you have, the facts you have, the things you have. So the design files are a necessary part of the process. They may be used in some cases, but they're not so close and so directly related as to actually constitute the criminal act that you could criminalize, right? The analogy here, if you want to talk about the car analogy, is not what you're hearing from the other side. The analogy is like a map. I hand the bank, you know, you can make a map. The bank robber can use it to get away from the bank. You can even load it as a piece of software into the car and use an electronic map. But the map is information. The map is speech. All kinds of people use maps, obviously, for innocent purposes. That's the kind of information we're talking about here. It's a tool that can sometimes be used in discrete circumstances for illegal activity, but you would never say that we can ban the map. The logic they're talking about is going to ban a lot of books and a lot of libraries about chemistry, about hardware, about engineering. That simply cannot be the law, and it's not. But again, their representation seems to be, looking at the CAD versus CAM distinction, that this statute, by its terms, does not cover CAD files. And that while it says may, which you're suggesting could be read in a permissive way, that the right reading in context, as even a matter of plain text, is capable of. If that's the case, I've won half the case, and I get a judgment in my favor. Because the case began when we were publishing all of the files, the CAD and the CAM, and they issued the civil cease and desist letter that said stop publishing everything. If they have now agreed to stop censoring half of the case, I win half of the case, and I get a judgment in my favor, not a dismissal, it's a complaint. Now, of course, I have the other half of the case to win, and I think I will, but that is a massive victory in our favor. If they, in July of 2018, when they issued the initial cease and desist letter, if they didn't know what they were censoring, that breaks the First Amendment. That is the core prior restraint. That's the reason the Constitution exists, because they can't just blindly censor people without knowing what they're talking about. That's literally what happened. They literally don't know how the process works. They don't know what these files do. They know they don't like guns, but they can't prohibit the self-manufacture of guns, because that's constitutionally protected, and they can't snap their fingers and make the technology go away. All that you're hearing about is a back... Yes, sir. I'm sorry, but isn't the distinction between 26 and 27 more of a hardware attenuation one? In other words, in 26, with the requisite computer hardware, they can employ to construct and manipulate. So they need to do a little bit more to get the hardware in order to construct the model. And then in 27, they're ready for insertion, but neither of these says there is an expressive purpose here. It's just a matter of how much hardware and software you need to emulate in order to stick it in and make a model. Neither of these speaks to the idea that there needs to be either a purpose or, you know, some expressive aspect to these. And under ICHBOL, Kalambli, don't you have... I mean, it's all about you need to show us there's an expressive value, and how have these advanced that ball? We do, Your Honor. This is in the same breadth. Four paragraphs after we say there are CAD files and CAM files, you get to paragraph 31, and we say we publish both. This is all part of what we publish, and we assert they have expressive values. That's in 31, right? They have these values in the abstract apart from these... They have these values in the abstract. Yes, Your Honor. What does that mean? I mean, I can have a lot of things in the abstract, but speech is not supposed to be values in the abstract. It's supposed to be what is it conveying to the human mind? I mean, it's the political nature of the speech. It's the expressive nature of the speech. It's the artistic nature. In the same way that creating the Statue of David is in a sense just an engineering activity, it's also an artistic activity. That may not be the view of the New Jersey Attorney General, but it is the view of the Constitution, and it is the view of defense distributed. This isn't just an object. This is a constitutionally sacrosanct object. And for the citizens to discuss the object, discuss what it might look like, discuss how you might very well legally create it, is a protected activity. They can do a lot of things as a state to regulate this process, to try to backdoor, essentially suppress, the manufacturing of firearms. But the one thing they can't do to get at the Second Amendment is run roughshod over the First Amendment. But don't you have to supply information in the concrete rather than in the abstract? Yes, Your Honor. I mean, we've shown that the diagrams matter. These are pictures. This is information. This is an art, just like a car can be art. It also drives. But the makers of Tesla will tell you they think it's beautiful. The same thing is true of the makers of firearms in America. And if they don't agree with that, let's litigate it on summary judgment. And we'll be happy to have artists in the field talk about the value this has, just like any engineering, any architect, anyone who creates a thing will tell you there's both functional value and artistic value. Where in either the statute or in the cease and desist letter are they reaching anything that can be characterized as the piece that could be art, that is the design, that's the expression, any sort of written text or instruction? Even the cease and desist letter is talking about code used to create firearms, or codes that enable individuals to print weapons. That seems very narrow as to the manufacturing aspect of the code. I think that some parts of the letter talk about those kinds of files. But the first paragraph and the last paragraph are all you need. You are directed to cease and desist from publishing printable gun computer files. That phrase, printable gun computer files, is not a term of art. It's not a technical term. We don't know what that covers. But I think the ordinary meaning, if you ask anyone on the street, is what is he telling defense distributors to do? Everything. Stop everything. Don't publish any of these files. Don't publish CAD, don't publish CAM. Stop everything. If that really is what they're going to hang the case on, is that when they said printable gun computer files, a made-up term, they were trying to convey the distinction that was created by federal regulations enacted three years later. Great, let's have that be the whole case. But that's not the case. Look at the last paragraph. The last paragraph says, as the chief law enforcement officer for New Jersey, I demand that you halt publication of the printable gun computer files. They knew what he was publishing, what defense distributor was publishing, and they said stop it all. The reason they enacted the statute is to stop what defense distributor was doing. They called defense distributor out by name. They called my client out by name at the enactment ceremony and said we're enacting this law to stop that guy. So maybe in some abstract context, with some other case, you can't tell what's being regulated. We all know that the attorney general here is trying to censor this company and the exact files that we have listed, chapter and verse, every detail. It at least pleads the case. We've at least passed the pleading scenario. There's no effective answer to the civil cease and desist letter, and the scienter argument is still extraordinarily strong. The last thing I'll say is about that is that it's not that this statute needs any scienter requirement. To pass constitutional muster, the statute has to say that the defendant knows that what they say is going to be involved in illegal conduct. Not just this abstract idea that they know it can be used in these processes, but that this particular speech will be used by a particular person for a particular illegal conduct, and this statute never does that, neither does the civil cease and desist letter. Did you know? Any further questions? Nothing further. I request that a transcript of this argument be made I request that a transcript of this argument be made